UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

EDWARD KOHLER and RACHEL KOHLER,

                    Plaintiffs,

    - against -

ASTEC, INC., JOHN DOES 1-5, and ABC
CORPORATIONS 1-5,

                    Defendants.

-----------------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 3 - 2014 ★

**BROOKLYN OFFICE**

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-CV-03249 (CBA) (VVP)

**AMON, Chief United States District Judge.**

On May 17, 2012, plaintiffs Edward Kohler and Rachel Kohler brought this action, under New York state tort law, seeking recovery for workplace injuries suffered by Edward Kohler. In an amended complaint filed on August 17, 2012, plaintiffs brought claims of negligence, loss of consortium, and negligent supervision against defendants Astec, Inc. ("Astec"), Astec Industries, Inc., CEI Enterprises, Inc., Heatec, Inc., Vanbro Corp., Plaza Electrical Contractors, Inc., as well as five John Doe individuals and five unknown corporations. (Docket Entry 8.) This Court's jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. Each of the named defendants other than Astec has since been voluntarily dismissed from the case.

Astec now moves for summary judgment on plaintiffs' negligence claims. At oral argument, on June 26, 2014, the Court granted Astec's motion in its entirety. The following sets out the reasoning underlying the Court's decision to grant Astec's motion.

## BACKGROUND

### I. The Asphalt-Making Process

The accident at issue in this case took place at an asphalt batch plant operated by Vanbro Corporation ("Vanbro") in Staten Island, New York. (Amended Complaint ("Compl.") at 4.) A

brief description of the asphalt-making process is helpful since the discussion that follows requires an understanding of the steps of that process.  Asphalt generally consists of two primary ingredients: (1) aggregate (a mixture of rocks and sand) and (2) hot liquid asphalt cement. (Astec, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 3.)  An asphalt batch plant, such as the one operated by Vanbro, contains a number of sequential operations that ultimately lead to the amalgamation of the primary ingredients in a pugmill mixer, a room-sized piece of machinery resembling, in form and function, a kitchen blender with two overlapping sets of blades. (See Def. Mem. at 5-6.)  The process begins with cold feed bins which contain unheated aggregate. (Deposition of Joseph Sullivan ("Sullivan Dep.") at 19.)  The cold feed bins release the aggregate onto conveyor belts for delivery to a dryer drum. (Id. at 20.)  The dryer drum slowly heats and dries the aggregate, then sends it to the slat conveyor, which is also called a hot elevator. (Deposition of Benny R. Harris, Jr. ("Harris Dep.") at 111-12.)  The slat conveyor moves the heated aggregate to the top of a screen deck, (id. at 112), where it is stored in "hot bins" until needed, (Deposition of Robert W. Doherty, Jr. ("Doherty Dep.") at 20-21).  Finally, from the hot bins, the aggregate is weighed and deposited into the pugmill mixer, where it is blended with hot liquid asphalt, before being dispensed through a hatch at the bottom of the mixer into an asphalt truck. (Id. at 20-21; Harris Dep. at 112.)  The mixer at issue in this case was located approximately 25 to 30 feet in the air and could be accessed for maintenance or inspection via a lift through a hatch in the bottom of the mixer. (Deposition of Edward Kohler ("E. Kohler Dep.") at 43.)

## II. Lockout/Tagout Procedures and Training

The term "lockout/tagout" describes the process by which a worker, while performing maintenance on a piece of equipment, cuts off power to it and places a lock on its power source

2

to prevent its activation. (Id. at 16-18.)  Before his accident in 2010, Edward Kohler attended a

ten-hour Occupational Safety and Health Administration safety training course, which included

instruction on lockout/tagout procedures. (Id. at 18, 21.)  In addition, Kohler's coworkers Robert

Doherty, Joseph Sullivan, and Robert Matsen provided him informal on-the-job training on

mixer maintenance and safety. (Id. at 34.)  The pugmill mixer lacked an official lockout/tagout

mechanism. (See id. at 33-34; Sullivan Dep. at 31.)  However, Kohler's coworkers testified that

they had improvised a makeshift stand-in.  Specifically, plant workers, before entering the mixer,

would "throw" its circuit breaker and thereby sever the flow of electrical power to it. (Astec,

Inc.'s Statement of Facts in Support of Motion for Summary Judgment ("Def. R. 56.1") ¶¶ 62-

63; Doherty Dep. at 124-26, 128; Sullivan Dep. at 31-32, 99.)  Several of Kohler's coworkers

stated that he would not have been injured if he had thrown the breaker prior to entering the

mixer. (Doherty Dep. at 126; Deposition of Robert Matsen ("Matsen Dep.") at 18; Sullivan Dep.

at 101.)  Kohler, however, testified in his deposition that, prior to his accident, he was unaware

of this informal power lockout method. (Id. at 35.)  Instead, he believed that the only way to

"ensure[] that there was no power going to [the mixer] was to make sure that the generators were

off . . . ." (E. Kohler Dep. at 33.)  Astec and Vanbro did not exchange information on their

respective safety procedures before Astec's employees began the belt calibration process.

(Vanderbilt Dep. at 60; Deposition of George Moody ("Moody Dep.") at 121; Sullivan Dep. at

62-63; Deposition of Tapu Lafaele, Jr., at 37-40.)

**III. The Accident**

On May 22, 2010, the day of the accident at issue, Kohler was working as a maintenance

engineer at Vanbro's asphalt batch plant. (Compl. at 4 ¶ 1; E. Kohler Dep. at 11.)  Although the

plant was not in regular production that day, (Doherty Dep. at 136), several Vanbro employees

3

and two Astec employees—Benny Harris and Tapu Lafaele (collectively "the Astec employees")—showed up to work at the plant, many of them in connection with a special project Vanbro had hired Astec to carry out. (Declaration of Benny R. Harris, Jr. ("Harris Decl.") ¶ 9; Declaration of Tapu Lafaele, Jr. ("Lafaele Decl.") ¶ 4.) The project entailed the calibration or "synchroniz[ation]" of a newly installed conveyor belt system. (Def. R. 56.1 ¶ 10; Doherty Dep. at 36-37, 42-43.) Several Vanbro employees at the plant that day testified that they understood they were required to be at work to help Astec with the belt calibration process. (Plaintiff's Response to Defendant Astec, Inc.'s Statement of Facts and Plaintiffs' Statement of Additional Material Facts ("Pl. R. 56.1") ¶ 46; see also Doherty Dep. at 59; Deposition of William J. Alles, Jr. ("Alles Dep.") at 44-45; Sullivan Dep. at 57-58; Deposition of Steven Reed ("Reed Dep.") at 41-43.) However, those same Vanbro employees testified that they did not understand Astec's employees to possess authority to give them orders. (See, e.g., E. Kohler Dep. at 81; Deposition of Robert C. Vanderbilt ("Vanderbilt Dep.") at 76; Doherty Dep. at 129-30 (noting that Harris never gave him orders and describing any assistance rendered to Harris as "helping him out" rather than submitting to his authority); Sullivan Dep. at 107; Reed Dep. at 52, 65.) Harris, the Astec employee, corroborated that understanding. (Harris Decl. ¶ 21.) Vanbro owner Robert Vanderbilt testified that Astec was not responsible for ensuring the safety of Vanbro's employees. (Vanderbilt Dep. at 76).

Kohler's job requirements as maintenance engineer, a position he held for over four years, included periodic inspection and maintenance of the pugmill mixer. (Def. R. 56.1 ¶ 4; Vanderbilt Dep. at 49; E. Kohler Dep. at 11.) Vanderbilt had instructed Kohler to perform a routine fifteen- to twenty-minute inspection of the mixer, which required Kohler to enter the machine, on the day of the accident. (E. Kohler Dep. at 41, 59-60.) Kohler testified that

Vanderbilt had asked him first to inspect the mixer and then, "after that . . . to assist" Astec with
its calibration work. (Id. at 59-60.)

    The belts being calibrated by the Astec employees were situated approximately 150 feet
away from the pugmill mixer and were not directly connected to it. (Def. R. 56.1 ¶ 17; see also
Harris Decl. ¶ 14; Harris Dep. at 111-12; Sullivan Dep. at 73.) The parties dispute to some
extent whether Astec's belt calibration involved the mixer. Both Harris and Lafaele deny that
their work "involve[d] the pugmill mixer." (Harris Decl. ¶ 13; Lafaele Decl. ¶ 6.) Yet a service
report submitted by Harris indicates that, on the day of the accident, he at some point examined a
conveyor belt attached to the mixer. (Plaintiff's Exhibit 2, Benny R. Harris, Jr., Service Report
("Harris Service Report") at 4.) Regardless, there does not appear to be any dispute that Astec's
work did not require the mixer to be turned on. (Harris Decl. ¶ 15; Lafaele Decl. ¶ 8.) Doherty's
testimony buttresses that proposition. He testified that he did not believe it necessary for Kohler
to finish inspecting the mixer before the Astec employees set to work synchronizing the
conveyor belts. (Def. R. 56.1 ¶ 15; see also Doherty Dep. at 58.)

    On the morning of the accident, Kohler arrived for work about an hour late and began
inspecting the mixer shortly thereafter. (E. Kohler Dep. at 40.) Doherty, a Vanbro plant operator
with several years' experience, (Doherty Dep. at 146; Sullivan Dep. at 62 (describing Doherty as
"like number one" at the plant)), was working near the mixer in the control house, a structure—
also called the batch room—that contains the controls for the mixer and other plant equipment,
(Doherty Dep. at 97). Doherty knew Kohler was inside the pugmill mixer. (Harris Decl. ¶ 11; E.
Kohler Dep. at 56; Doherty Dep. at 128.) Moments before entering the mixer, Kohler had told
Doherty that, upon completing his inspection, he would call from "the extension down here at
my desk to you up in the batch room." (E. Kohler Dep. at 43.) After Kohler had entered the

mixer, he spoke once more with Doherty through an opening in the mixer's base. (Id. at 44.)
Kohler acknowledged that he did not "throw" the mixer's breaker before entering the machine.
(Id. at 33.) The flow of electricity was therefore not "locked out" from the mixer. (Id. at 33-34.)

       Like Doherty, Harris was working in the control house the morning of Kohler's accident.
(Pl. R. 56.1 ¶ 50; see also Harris Dep. at 118; Doherty Dep. at 38.) However, unlike Doherty,
Harris was not aware that Kohler was inspecting the pugmill mixer. (Harris Decl. ¶ 16; see also
Doherty Dep. at 56-57, 128-29 (stating he did not know whether—or have reason to believe
that—Harris knew Kohler was in the pugmill mixer the day of the accident); Sullivan Dep. at
105-06 (same); E. Kohler Dep. at 56-58 (acknowledging that Kohler had no proof to
contradict—or reason to disbelieve—the assertion that Harris did not know he was in the pugmill
mixer the day of the accident.) Doherty testified that, at some point that morning, he warned
Harris not to "pull in" the bin designated "Bin Two" during the belt synchronization. (Doherty
Dept. at 45.) Bin Two contained material that, if removed from the bin, would pile up and clog
downstream parts of the asphalt-making process because those downstream parts were not in
operation that day. (Id. at 44-45.) Harris nevertheless turned on all the conveyor belts, including
one that pulled material from Bin Two, which caused material to overfill the back of one of the
plant's dryers. (Id.) After he detected the problem, Doherty turned off the belts. (Id. at 52.) He
believed, he later testified, that in order for Harris to continue synchronizing the belts, it was
necessary to perform a series of steps that would clear the Bin Two material from the plant's
system altogether. (Def. R. 56.1 ¶¶ 34-35; see also Doherty Dep. at 44-54.) Both Astec
employees stated that they were at all times unaware that Doherty was planning to clear the
system by activating the plant. (Harris Decl. ¶¶ 19, 23; Harris Dep. at 118; Lafaele Decl. ¶¶ 12,
16; see also Doherty Dep. at 134 (corroborating Harris' claim).)

Doherty began the process of clearing the system by powering up the bag house,[1] which caused the plant's generator to die. (Def. R. 56.1 ¶¶ 36-37; see also Doherty Dep. 50.) Doherty then left the control room, got the attention of an engineer, and had him restart the generator. (Def. R. 56.1 ¶¶ 42-44; see also Doherty Dep. at 50, 105.) Due to a "quirk[]" of Vanbro's generator, Doherty testified, it was frequently necessary, to avoid generator failure, to put "a load on the generator"—meaning to activate another piece of heavy machinery—prior to starting to the bag house. (Def. R. 56.1 ¶¶ 40-41; see also Doherty Dep. 48.) After receiving confirmation that the generator had been restarted, Doherty returned to the control house and turned on the pugmill mixer in order to "put a load" on the generator. (Def. R. 56.1 ¶ 45; see also Doherty Dep. 50, 105.) Almost immediately, Doherty remembered that Kohler was in the mixer, turned it off, and ran from the control room check on his colleague. (Def. R. 56.1 ¶ 50; see also Doherty Dep. 51, 105, 135.) Kohler suffered serious injuries as a result of being inside the mixer when it was turned on. (See, e.g., E. Kohler Dep. at 47.)

## STANDARD OF REVIEW

Summary judgment is appropriate if the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A 'genuine issue' exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 498 (2d Cir. 2001). All reasonable inferences must be drawn in the nonmoving party's favor. See Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999). It is the "burden of the moving party to show initially the absence of a genuine issue

---

[1] The bag house is a large filter building located near the conveyor belt Harris was calibrating the day of the accident. (See Def. R. 56.1 ¶ 36.)

concerning any material fact." Garanti Finansal Kialama A.S. v. Aqua Marine & Trading Inc.,
697 F.3d 59, 73 n.18 (2d Cir. 2012) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).
When the moving party meets its burden, the nonmoving party cannot rest on mere allegations,
denials, or "metaphysical doubt as to the material facts," but must instead come forward with
specific facts showing that there is a genuine issue for trial.  See Caldarola v. Calabrese, 298
F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475
U.S. 474, 587 (1986)).

## DISCUSSION

To state a cause of action for negligence under New York law, a plaintiff must establish
four elements: (1) a duty recognized by law, (2) a breach of that duty, (3) a "reasonably close
causal connection between [defendant's] conduct and the resulting injury", and (4) injury
resulting from the breach.  McCarthy v. Olin Corp., 119 F.3d 148, 156 (2d Cir. 1997) (internal
quotation marks omitted); see also Becker v. Schwartz, 46 N.Y.2d 401, 410 (1978).  Astec
contends in its summary judgment motion that Kohler has failed to establish two elements: the
existence of a duty owed by Astec to Kohler and the requisite causal connection.[2]

## I.  Duty

"[I]n the absence of . . . a duty, as a matter of law there can be no liability." Johnson v.
Jamaica Hosp., 62 N.Y.2d 523, 528 (1984).  Whether such a duty exists is a question of law for
the Court to determine.  See McCarthy, 119 F.3d at 156.  Kohler asserts essentially three theories
that he believes support his contention that Astec owed him a duty.  First, he argues that Astec,
as a general contractor or subcontractor, owed him a duty pursuant to New York common law
and New York Labor Law § 200.  Second, he argues that even if Astec owed him no general

---

[2] Although there are two plaintiffs in this case—Edward and Rachel Kohler—for ease of reference, given that the discussion focuses only on Edward Kohler, the Court will refer to plaintiffs in the singular, as "Kohler."

duty of care, it may be held liable because it launched an instrument of harm at him. Third, he argues that Astec had a duty of care under the federal Occupational Safety and Health Act, which he claims it violated when it failed to comply with lockout/tagout procedures required by regulations promulgated pursuant to that statute.

### A. General Duty of Care of Contractor/Subcontractor

New York Labor Law § 200 codifies "the common-law duty imposed upon an owner or general contractor to provide construction site workers with a safe place to work." Comes v. N.Y. State Elec. & Gas Corp., 82 N.Y.2d 876, 877 (1993). "This provision applies to owners, contractors, or their agents, who have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." Paladino v. Soc'y of N.Y. Hosp., 762 N.Y.S.2d 637, 639 (2d Dep't 2003) (quoting Russin v. Picciano & Son, 54 N.Y.2d 311, 317 (1981)) (internal quotation marks omitted). There are two broad categories of cases that implicate the duties of owner and contractors to furnish workers a safe workplace. First, there are "those where workers are injured as a result of dangerous or defective premises conditions at a worksite," and second, there are "those involving the manner in which the work is performed." Ortega v. Puccia, 866 N.Y.S.2d 323, 329 (2d Dep't 2008). In the first category of cases, "a general contractor may be liable in common-law negligence and under Labor Law § 200 only if it had control over the work site and either created the dangerous condition or had actual or constructive notice of it." Martinez v. City of New York, 901 N.Y.S.2d 339, 345 (2d Dep't 2010); see also Comes, 82 N.Y.2d at 877-78 (applying standard). In the second category of cases—those based on "alleged defects or dangers arising from a [defendant's work] methods or materials"—"recovery against the owner or general contractor cannot be had unless it is shown that the party to be charged exercised some supervisory control over the operation." Ross v.

9

Curtis-Palmer Hydro-Elec. Co., 81 N.Y.2d 494, 505 (1993).  Like a general contractor, a

subcontractor may have a duty to provide a safe workplace under § 200 or the common law if the

plaintiff shows "that authority was conferred on the subcontractor to supervise and control the

activity which produced the injury." Romang v. Welsbach Elec. Corp., 852 N.Y.S.2d 144, 145

(2d Dep't 2008) (internal quotation marks omitted); see also Lopes v. Interstate Concrete, 741

N.Y.S.2d 73, 74 (2d Dep't 2002) ("The determinative factor on the issue of control is not

whether a subcontractor furnishes equipment but whether he has control of the work being done

and the authority to insist that proper safety practices be followed.").

### 1. The Authority or Control Requirement

Kohler contends that his accident "stem[med] from both a dangerous condition and the

manner in which the work was being performed." (Plaintiffs' Memorandum of Law in

Opposition to Defendant Astec's Motion for Summary Judgment ("Pl. Mem.") at 10.)  He fails,

however, to raise a genuine issue of material fact as to whether a duty exists under either theory

because he cannot point to any facts supporting the predicate at the core of each—that Astec had

authority or control over the work site or over the performance of the specific work tasks that

caused Kohler's injuries.  Even reading the record in the light most favorable to Kohler, the

Court concludes the undisputed facts compel a finding that Astec lacked the authority to

supervise or control the activity that produced the injury, to wit, Kohler's work in the pugmill

mixer and Doherty's work in the control house.  Similarly, there is no support in the record for

the proposition that Astec had any general supervisory authority over the Vanbro plant as a

whole or over safety practices there.

First, there are no facts establishing a connection between Kohler's work in the pugmill

mixer and Astec's belt calibration.  Although Astec's employees may have had some authority

and control over certain work directly related to servicing the plant's conveyor belts, the record clearly indicates that Kohler's inspection fell well outside the scope of whatever authority and control Astec possessed.  There is no dispute that Astec's employees were on Vanbro's premises the day of the accident for the purpose of synchronizing the plant's conveyor belts. (Def 56.1 ¶ 10; Harris Decl. ¶ 9.)  The conveyor belts and the pugmill mixer, however, are physically remote from one another and, moreover, sequentially remote in the chain of processes that constitute asphalt production. (See Harris Decl. ¶ 14; Harris Dep. at 111-12; E. Kohler Dep. at 90 (detailing how the process could "run a while" without activating the pugmill mixer and describing various steps that could occur without—and independently of—the mixer); see also Sullivan Dep. at 73.) Astec's belt calibration could be and was conducted without turning on the pugmill mixer. (See Harris Decl. ¶ 15; Lafaele Decl. ¶ 8.)[3]  Furthermore, the parties agree that it was unnecessary for Kohler to complete his inspection in the mixer before Astec began synchronizing the conveyor belts. (Def. R. 56.1 ¶ 15.)  Kohler's work was separate from Astec's, and he could carry it out safely while Astec calibrated the belts.

Apart from the physical separation of Kohler's inspection and Astec's belt calibration, the record also makes plain that, at the time he was injured, Kohler was working under direct orders from Vanbro and Vanbro alone.  Indeed, inspection of the pugmill mixer had been part of his regular work duties for years. (Def. R. 56.1 ¶ 4; see also Vanderbilt Dep. at 49; E. Kohler Dep. at 11.)  Kohler himself testified that Vanderbilt, Vanbro's owner, had instructed him to inspect the pugmill mixer that morning, (E. Kohler Dep. at 59), and for his part, Vanderbilt

---

[3] The contention to the contrary put forth by plaintiff's counsel at oral argument turned on William Alles' deposition testimony.  However, Alles never made any representation as to the operation of the plant the day of Kohler's injury. He testified, as defense counsel noted at oral argument, that he did not know what exactly Astec's work at the plant entailed. (Alles Dep. at 45.) To the extent Alles testified to the anticipated activation of the pugmill mixture the day Kohler was injured, he was clearly conjecturing based on how the plant tended to operate.  He evinced no personal knowledge of the pugmill mixer's involvement in the plant's operation that day. (Id. at 62-64.)

11

expressly stated that Kohler's inspection of the mixer bore no connection to Astec's calibration project, (Vanderbilt Dep. at 50). Kohler was working on orders from his own employer, and there is no indication that Astec had the authority to tell him how to carry out or to command him to stop his inspection of the pugmill mixer. Although there is some indication that, but for Astec's belt calibration project, Kohler and other Vanbro employees would not have been onsite that day, (Doherty Dep. at 59; Alles Dep. at 44-45; Reed Dep. at 41-43), there is no indication that Kohler's work inside the pugmill mixer was on behalf of or otherwise for the benefit of Astec. To the contrary, Kohler explicitly testified that only "after" he inspected the mixer did his employer expect him to "assist in the calibrations of the plant," that is, to help Astec synchronize the belts. (E. Kohler Dep. at 59-60 (emphasis added); see also Vanderbilt Dep. at 49-50.)

Kohler's reliance on Freeo v. Perosi and Sotomayor v. Metropolitan Transportation Authority is misplaced for precisely this reason. In Freeo, the defendants' employees gave instructions to the plaintiff and his coworkers, and they worked closely on the same projects, including that which injured the plaintiff. 387 N.Y.S.2d 268, 270 (2d Dep't 1976); cf. Rizzuto v. L.A. Wenger Contracting Co., 91 N.Y.2d 343, 352-53 (1998) (finding sufficient evidence that a duty existed where general contractor "had control over the methods of the subcontractors and other worksite employees" and "had the authority to direct" them "to not engage in an operation while another potentially hazardous activity . . . was taking place within the immediate area"). Sotomayor merely states in conclusory fashion that movant on summary judgment "failed to establish, prima facie, that it did not have control over the work site . . . ." 938 N.Y.S.2d 640, 642 (2d Dep't 2012). Contrary to Kohler's assertion, this case is not "[l]ike Sotomayor" because there is not "at a minimum, conflicting evidence as to whether Astec's employees had control

12

over the worksite . . . ." (Pl. Mem. at 11.)  Instead, the evidence here is substantially free from

conflict on that point.

Finally, the evidence in the record belies any suggestion that Astec owed Kohler a duty

because it controlled or had supervisory authority over Doherty's actions when he started the

pugmill mixer.  The uncontradicted testimony of the Vanbro employees at the plant that morning

indicates that, although they believed that they were at work to assist Astec with the belt

calibration, they did not understand Astec's employees to have any authority over them. (See,

e.g., E. Kohler Dep. at 81; Vanderbilt Dep. at 76; Sullivan Dep. at 107; Reed Dep. at 52, 65;

Doherty Dep. at 129-30 (noting that Harris never issued orders to him and describing "helping

[Harris] out" rather than responding to his authority); see also Harris Decl. ¶ 21 (corroborating

Vanbro employees' claims that he had no authority over them).)[4]  In addition, there is no

evidence that Astec took steps to become responsible for the safety of Vanbro's employees. (See,

e.g., Vanderbilt Dep. at 76 (stating that there was no agreement that Astec was going to provide

for safety at the plant).)

In light of all the evidence presented, it is plain that, besides belt calibration, Astec did

not have authority or control over any aspect of the Vanbro plant, let alone over the plant in its

entirety. See Hughes v. Tishman Const. Corp., 836 N.Y.S.2d 86, 88-89 (1st Dep't 2007)

(granting summary judgment for insufficient authority and control even where defendant's

employee "observed the concrete work and encouraged [plaintiff] and his coworkers to 'hurry

up' and finish spreading concrete" when plaintiff was injured).  Nothing in the record rebuts

---

[4] If read in an exceedingly narrow manner, Matsen's deposition testimony could be read to contradict his colleagues'
near-universal agreement on the issue of Astec's lack of authority over them.  Matsen answered, "Yes," to the
question "Did [Harris] have the authority to tell you what to do?" (Matsen Dep. at 53.)  However, in context,
Matsen's testimony suggests that Harris did not and could not order Matsen to do anything in particular, at least in
part because labor union rules forbade it. (Id. at 53-54.)  Instead, Matsen's testimony can be more accurately read to
imply—in line with the deposition testimony of his coworkers at Vanbro—that they would help Harris when he
requested help, not out of a sense of obligation but as a matter of workplace comity.

13

Astec's strong showing that it was on the worksite merely to complete one specified task—the calibration of the conveyor belts. There is no proof that Kohler's work in the pugmill mixer was in any way related to Astec's limited task.[5] Nor is there any proof that Astec had "authority to supervise or control the performance of [Kohler's] work." Ortega, 866 N.Y.S.2d at 330; see also Reilly v. Newireen Assocs., 756 N.Y.S.2d 192, 194, 198 (1st Dep't 2003) (finding dispositive, for summary judgment purposes, that plaintiff's coworker, and not defendant's employee, had given plaintiff order that led to injury); Smith v. County of Nassau, 662 N.Y.S.2d 70, 71 (2d Dep't 1997) (granting summary judgment where defendant did not exercise control over aspect of work that injured plaintiff). Finally, there is no evidence to suggest that Astec had "the authority to insist that proper safety practices be followed" by Vanbro workers like Kohler and Doherty. Lopes, 741 N.Y.S.2d at 74. Accordingly, there is no genuine issue of material fact as to whether Astec exercised the requisite authority and control over the Vanbro plant necessary to create the duty here alleged by Kohler.

### 2. The Manner of Performance Theory of Liability

The mere fact that Vanbro employees had to report to work the day of Kohler's accident because of Astec's calibration is not alone enough to create a duty on Astec's part in the absence of any evidence that "the activity which produced [Kohler's] injury" fell within the ambit of Astec's assignment. Romang, 52 N.Y.S.2d at 145. The absence of authority or control, on its own, is dispositive with respect to Kohler's theory that his injury resulted from "the manner in which [his] work [was] performed." Ortega, 866 N.Y.S.2d at 329. The Court therefore rejects

---

[5] Harris' service report includes a notation that, on the day of Kohler's accident, he discovered a "[r]ecycle [c]onveyor to [p]ugmill" was not operating properly and was not "wired according to the prints." (Harris Service Report at 4.) That does not alter the conclusion that Kohler's work on the mixer was unconnected to Astec's calibration. It is undisputed that the conveyor belt Harris was servicing at the time of Kohler's accident was physically remote from the pugmill mixer. Furthermore, there is no evidence that work on the conveyor belt to the pugmill mixer would have required the mixer itself to be in operation.

14

Kohler's argument that Astec owed a duty to him because of its control over the workplace or over his inspection.

### 3. The Dangerous Conditions Theory of Liability

The Court also rejects Kohler's dangerous conditions theory of liability. First, Astec's lack of control over the Vanbro plant as a whole disposes of any claim of duty grounded in this theory. See Martinez, 901 N.Y.S.2d at 345 (holding that duty on dangerous conditions theory requires that contractor had "control over the work site and either created the dangerous condition or had actual or constructive notice of it"). Second, even if Astec otherwise had control over the worksite, there is no evidence in the record that Astec had notice of the dangerous condition at issue. See id. (requiring, for finding of duty when defendant did not create dangerous condition on premises, that defendant possess "actual or constructive notice" of the condition that led to plaintiff's injury). Although Kohler points to evidence that Astec employees had general safety concerns about the Vanbro plant, those concerns were based on problems such as exposed wiring and rusted belts. (See Harris Dep. at 85.) There is no suggestion in the record that Astec knew of any dangerous condition that actually contributed to Kohler's injury.[6]

Nor can it be said that Astec created the dangerous condition that led to Kohler's injury. The Court reaches that conclusion for substantially the same reasons it concludes there is insufficient evidence that Harris' conduct was the proximate cause of Kohler's injury. See Part II infra. The record cannot be fairly read to suggest that Harris pulling material from Bin Two— rather than Doherty activating the pugmill mixer—actually created the dangerous condition that

---

[6] Kohler's citation to McLean v. Webster Avenue Associates is therefore inapposite. In that case, the defendant's workers had expressed concern about the dangerous condition of the same dumbwaiter system that ultimately injured the plaintiff. 951 N.Y.S.2d 185, 189 (2d Dep't 2012).

led to Kohler's injury. The Court therefore rejects Kohler's argument that Astec owed any general duty to him under the common law or New York Labor Law § 200.

## B. The Harmful Instrumentality Exception

Alternatively, Kohler asserts that, even if Astec did not owe him a general duty of care, it took on a specific duty to him when Harris turned on the conveyor belt and pulled material from Bin Two, launching an instrument of harm at him. (Pl. Mem. at 15-16.)[7] The Court disagrees. The record cannot support the inferences necessary for Kohler to establish the duty element under a harmful instrumentality theory.

Kohler's argument turns on New York case law that has recognized three exceptions to the general rule that "a contractual obligation, standing alone, will . . . not give rise to tort liability in favor of a third party." Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 138 (2002). The exception Kohler relies on arises "where the contracting party, in failing to exercise reasonable care in the performance of his duties, launche[s] a force or instrument of harm . . . ." Id. at 140 (citing H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 163 (1928) (Cardozo, C.J.)). Under this harmful instrumentality exception, "a defendant who undertakes to render services and then negligently creates or exacerbates a dangerous condition may be liable for any resulting injury." Id. at 141-42. Yet, "however negligently [defendant's employee] may have performed his job," that negligence, on its own, does not impose on defendant a duty when the "force or instrument of harm" was launched by "a third person who, so far as the record

---

[7] Kohler describes the "instrument of harm" as "the conveyor belt without an alarm system." (Pl. Mem. at 15.) Presumably, he means to imply that, if an alarm had sounded when Harris turned on the conveyor belt, Kohler would have been aware that, subsequently, Doherty would turn on the pugmill mixer. It is not at all obvious Kohler would have made that connection. In fact, given the long list of intervening steps between the two acts, it seems highly unlikely that he would have made that leap of logic. See Part II infra.

16

shows, acted independently, and without [defendant's employee's] knowledge." Rahim v. Sottile Sec. Co., 817 N.Y.S.2d 33, 36 (1st Dep't 2006).

The problem with Kohler's theory is that no evidence in the record suggests Harris negligently created or exacerbated a dangerous condition. The evidence indisputably shows that the dangerous condition at issue arose only when Doherty, and not Harris, chose to activate the pugmill mixer.[8] (Def. R. 56.1 ¶¶ 48-50.) Doherty's decision to turn on the mixer was not—by his own admission—a necessary consequence of Harris' action. Doherty testified that in order to clear the material from the dryer, he had to turn on "some other piece of equipment" to prevent the generator from cutting out. (Doherty Dep. at 48.) But it is undisputed that Doherty did not need to turn on the pugmill mixer in particular.[9] Moreover, the record is devoid of facts that suggest Harris knew or should have known (1) that Doherty would decide to turn on the pugmill mixer and (2) that Kohler was in the mixer.[10] In fact, the deposition testimony of both Harris and Doherty supports the opposite inference. (See Harris Dep. at 118 (stating he did not know Doherty was going to turn on the mixer); Doherty Dep. at 52-53, 56-57, 128-29 (testifying that he did not have any discussions with Harris about activating the mixer or have any reason to believe Harris knew Kohler was in the mixer).) "[H]owever negligently [Harris] may have

---

[8] In that respect, this case differs from Genen v. Metro North Commuter Railroad, on which Kohler relies. (Pl. Mem. at 15.) There, the defendant's unmediated action – the negligent performance of a snow removal contract—directly exacerbated slippery conditions. 690 N.Y.S.2d 213, 215 (1st Dep't 1999). Here, on the other hand, a series of events not attributable to Harris intervened between Harris activating the conveyor belt and Doherty turning on the pugmill mixer.

[9] Kohler argues Robert Matsen's testimony runs contrary to Doherty's statement. (Pl. R. 56.1 ¶ 46.) Matsen stated at his deposition that Doherty would have had to activate both the pugmill mixer and a device called a drag conveyor to prevent the generator from cutting out. (Matsen Dep. at 42-43.) However, Matsen acknowledged there were other pieces of machinery Doherty could have run to "put a load on the generator," specifically, "a dryer." (Id. at 43.)

[10] Kohler's contention that Harris saw him near or in the mixer, (see Pl. Mem. at 18), does not put any issue of material fact in dispute. That allegation relies on rank speculation about the focus of Harris' attention at particular moments in the run-up to the accident. Instead of adducing "specific facts showing that there is a genuine issue for trial," Kohler raises nothing more than "metaphysical doubt as to the material facts." Caldarola, 298 F.3d at 160 (quoting Matsushita, 475 U.S. at 587) (emphasis in original).

17

performed his job" by pulling material from Bin Two in contravention of Doherty's express warning, the "force or instrument of harm" was launched by Doherty, "a third person who, so far as the record shows, acted independently, and without [Harris'] knowledge." Rahim, 817 N.Y.S.2d at 36. Accordingly, there is no evidence from which a factfinder could conclude that Astec owed Kohler a duty because Harris launched an instrument of harm at him.

### C. The OSHA Regulations

Finally, Kohler suggests that the federal Occupational Safety and Health Act ("OSHA") imposed on Astec certain duties toward him or, at the very least, that Astec's alleged violations of regulations promulgated pursuant to OSHA constitute evidence of Astec's negligence. (Pl. Mem. at 18-20.) Specifically, Kohler argues that Astec breached duties arising from 29 C.F.R. § 1910.147(f)(2). That regulation provides as follows:

> (i) Whenever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures.
>
> (ii) The on-site employer shall ensure that his/her employees understand and comply with the restrictions and prohibitions of the outside employer's energy control program.

29 C.F.R. § 1910.147(f)(2). Kohler asserts that Astec failed to inform Vanbro and its employees of Astec's lockout/tagout procedures. That failure, Kohler argues, contributed to his accident. This argument, like his others, is unavailing.

### 1. No Private Right of Action Created by OSHA Regulations

As an initial matter, any purported violation of OSHA's regulations cannot render Astec liable to Kohler where it did not possess a duty independent of the regulations. That is because employees do not have a private right of action for violations of OSHA's requirements. Donovan v. Occupational Safety & Health Review Comm'n, 713 F.2d 918, 926 (2d Cir. 1983); see also Augustus v. AHRC Nassau, 976 F. Supp. 2d 375, 400 n.42 (E.D.N.Y. 2013) ("OSHA provides

no private right of action."). Kohler's first contention therefore cannot succeed. The regulations and their organic statute provide for no private right of action.

## 2. Absence of an Independent Source of a Duty

However, Kohler goes one step further and suggests that, even if the OSHA regulations do not themselves provide a cause of action, Astec's purported violation of OSHA serves as evidence of Astec's negligent conduct. That argument suffers from two fatal flaws. First, although "there is no reason that a violation of OSHA regulations, like other Federal or State Regulations, should not be considered as some evidence of negligence under Labor Law § 200 and the common law," Landry v. Gen. Motors Corp., 621 N.Y.S.2d 255, 256 (4th Dep't 1994), that regulatory violation is only evidence that a defendant breached a duty already owed to the plaintiff, see Cappellini v. McCabe Powers Body Co., 713 F.2d 1, 4-5 (2d Cir. 1983). It says nothing about the existence of a duty in the first place. OSHA cannot "enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities" of those covered by the statute. 29 U.S.C. § 653(b)(4); see also Kaczmarek v. Bethlehem Steel Corp., 884 F. Supp. 768, 781 (W.D.N.Y. 1995) (noting that OSHA cannot "be used to expand or in any other manner affect [defendant's] common law or statutory liability" and that just because an OSHA violation may be some evidence of negligence, that "does not mean . . . plaintiff has a 'separate' negligence claim based on OSHA").

Here, there is no evidence in the record tending to show that Astec had control of Kohler's activity or otherwise owed him a duty of care. See Parts I.A & I.B supra. Because there is no independent source of duty, the mere fact of an OSHA violation—even if proved—would have no bearing on Astec's liability. See, e.g., Murdoch v. Niagara Falls Bridge Comm'n, 917 N.Y.S.2d 501, 502 (4th Dep't 2011) (finding that, as matter of law, OSHA violation cannot lead

to liability when jury finds "that defendant did not have the authority to control the activity that caused plaintiff's injury" and so owed no duty of care to plaintiff).

### 3. No Violation of OSHA Regulations

The outcome would be no different if Kohler could point to a duty Astec owed him and an OSHA violation could, in theory, constitute evidence of breach of that duty. That is because it is far from clear that Astec violated the regulations in question. First, New York courts have held that OSHA governs only the employer-employee relationship, and "imposes no duty on an owner or general contractor." Pellescki v. City of Rochester, 605 N.Y.S.2d 692, 694 (4th Dep't 1993); see also Khan v. Bangala Motor & Body Shop, Inc., 813 N.Y.S.2d 126, 129 (2d Dep't 2006).[11] Astec was plainly not Kohler's employer.

Second, the regulation relied on by Kohler applies "[w]henever <u>outside servicing personnel</u> are to be engaged in activities covered by the scope and application of this standard . . . ." 29 C.F.R. § 1910.147(f)(2)(i) (emphasis added). The regulation's scope is limited to instances where those outside personnel are involved in "the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." Id. § 1910.147(a)(1)(i). Courts and the Occupational Safety and Health Administration—the agency responsible for promulgating and enforcing OSHA regulations—have interpreted the regulation to apply where servicing or maintenance puts onsite workers in sufficient proximity to a machine that, if it were unexpectedly activated, it could harm them. See, e.g., Otis Elevator Co. v. U.S. Sec'y of Labor,

---

[11] Kohler asserts that <u>Khan</u> "is inapposite here." (Pl. Mem. at 20.) However, in the paragraph in his brief leading to that conclusion, his summary of the case explains precisely why it is, to the contrary, very much apposite. In that case, as here, the defendant was not plaintiff's employer, and the Second Department noted, correctly, that the OSHA regulations did not themselves impose on the defendant a duty toward the plaintiff. <u>Khan</u>, 813 N.Y.S.2d at 129.

762 F.3d 116, 121 (D.C. Cir. 2014) (finding repair of exterior of elevator car permissibly within scope of regulation where outside service person was injured when part of elevator moved suddenly); Lockout/Tagout, 54 Fed. Reg. 36,644, 36,646 (Sept. 1, 1989) (listing examples of work covered by the regulation, all of which place workers in close proximity to equipment that, if activated, could harm them).

Astec's belt calibration, conducted from within the control house, (Harris Dep. at 118; Doherty Dep. at 38), did not require any employee—of Astec or Vanbro—to work anywhere near machines whose "unexpected energization" could injure them. 29 C.F.R. § 1910.147(a)(1)(i). Astec's work, therefore, did not fall within the ambit of § 1910.147. There can be little doubt that Kohler's work in the pugmill mixer, on the other hand, did constitute activity covered by the regulation. See 54 Fed. Reg. at 36,646 (citing as example of covered activity employee working inside "asphalt mixing machine"). However, Kohler was a Vanbro employee, not an "outside" worker, as required by the regulation. 29 C.F.R. § 1910.147(f)(2)(i). As discussed above, the record does not support Kohler's contention that his inspection was related to the belt calibration performed by Astec's concededly "outside" employees. See Part I.A supra. Instead, the record indicates that the inspection and the calibration were entirely separate activities. By Kohler's own admission, his work was done for and at the instruction of his employer, not Astec. (E. Kohler Dep. at 41, 59-60.)

Accordingly, it is highly doubtful that Kohler would be able to demonstrate that Astec violated § 1910.147(f)(2). The undisputed fact that Vanbro and Astec did not exchange safety information, (Vanderbilt Dep. at 60; Moody Dep. at 121), is therefore entirely irrelevant to the existence of a duty of care on Astec's part.

21

## II. Proximate Cause

Astec's second argument is that it is entitled to summary judgment because Kohler has failed to adduce facts from which a jury could infer a sufficiently proximate causal connection between Astec's alleged negligence and Kohler's injury. Generally, "it is for the finder of fact to determine legal cause, once the court has been satisfied that a prima facie case has been established." Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 315 (1980); see also Lombad v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 215-16 (2d Cir. 2002) ("Under New York law . . . decisions as to a lack of reasonable care and its nexus to a plaintiff's injury are quintessential jury questions."). "To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury." Derdiarian, 51 N.Y.2d at 315.

"Proximate or legal cause is defined as that 'which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred.'" Caraballo v. United States, 830 F.2d 19, 22 (2d Cir. 1987) (quoting Rider v. Syracuse Rapid Transit Ry. Co., 171 N.Y. 139, 147 (1902)). It is axiomatic that, "when the actions of a third person . . . intervene between the defendant's conduct and the injury, the defendant is liable in negligence only when the intervening acts are a normal and foreseeable consequence of defendant's conduct." Caraballo, 830 F.2d at 22; see also Saugerties Bank v. Del. & Hudson Co., 236 N.Y. 425, 431 (1923) ("[T]he act of one person cannot be said to be the proximate cause of an injury when the act of another person has intervened and directly inflicted it."). On the other hand, where the third person's "intervening actions are not a normal and foreseeable consequence of the defendant's conduct," that person's "conduct becomes a superseding cause which absolves the defendant of liability." Carballo, 830 F.2d at 22. Because questions of what

22

is "normal" or "foreseeable" are "the subject of varying inferences," these issues, like proximate cause generally, are usually for the fact finder to resolve. Derdiarian, 51 N.Y.2d at 315. Nevertheless, in instances "where only one conclusion may be drawn from the established facts"—generally cases involving "independent intervening acts which operate upon but do not flow from the original negligence"—the court may make a proximate cause determination as a matter of law. Id. An injury is not a foreseeable consequence of a defendant's negligent act when the risk that ripened into plaintiff's injury is "a different kind of risk from that created by defendant['s] negligence . . . ." Rodriguez v. Pro Cable Servs. Co. P'ship, 697 N.Y.S.2d 440, 442 (4th Dep't 1999) (citing Ventricelli v. Kinney Sys. Rent A Car, 45 N.Y.2d 950, 952 (1978)).

Because Kohler has failed to establish a prima facie case that Harris's actions were a substantial cause of his injury, the Court finds that Astec is entitled to judgment on the issue of proximate cause as a matter of law. Harris' actions in pulling material from Bin Two bore some causal relationship to Kohler's injuries. After all, Doherty would not have been prompted to attempt to clear the system were it not for Harris' conduct. However, simple "but for" causation is not a substitute for proof of proximate causation. See Sullivan v. B & A Const., Inc., 307 N.Y. 161, 164 (1954). A long sequence of events had to occur after Harris pulled the material from Bin Two in order for Kohler to be injured. That sequence of events renders Harris' conduct too remote from the injury to be part of "a natural sequence." Caraballo, 830 F.2d at 22 (internal quotation marks omitted). Importantly, the crucial intervening event was unpredictable negligence on the part of Doherty—not Harris. It was hardly foreseeable that a plant employee with Doherty's experience would activate the pugmill mixer when he knew a colleague was inside it conducting an inspection.

23

The parties largely do not dispute the sequence of events that led to Kohler's injury. After Harris jammed the dryer with material he pulled from Bin Two: (1) Doherty decided to try to clear the belt of material; (2) Doherty decided to do so by activating the bag house; (3) when attempting to activate the bag house, the generator died; (4) because of a "quirk" in the system, restarting the generator and preventing it from dying again required activating another piece of machinery to "put a load" on the generator; and (5) Doherty decided to "put a load" on the generator by activating the pugmill mixer in which Kohler was working rather than another piece of machinery.[12] (Def. R. 56.1 ¶¶ 20-21, 34-38, 40, 45.) These intervening events were not foreseeable to Harris when he pulled material from Bin Two. There is no evidence Astec's employees knew or should have known that Doherty would attempt to clear the plant's overall system after the dryer became clogged. (Harris Decl. ¶¶ 19, 23; Harris Dep. at 118; see also Doherty Dep. at 134 (corroborating Harris' claim).) There is no evidence Astec's employees knew or should have known of the "quirk" that caused the generator to die and required the activation of other machinery. (See Harris Decl. ¶ 19, 23, 24 (statement that Harris was unaware of those "quirks"); Harris Dep. at 118.) There is no evidence Astec's employees knew or should have known that Kohler was inspecting the pugmill mixer. (See Harris Decl. ¶ 16; see also Doherty Dep. at 56-57, 128-29; E. Kohler Dep. at 56-58.) There is certainly no evidence Astec's employees knew or should have known Doherty would negligently choose to turn on the pugmill mixer without telling Kohler, who he knew was inside it. Given the intervening third-party acts and their unforeseeability from Harris' perspective, it strains credulity to say Harris' actions were a "substantial cause"—or, indeed, anything more than a tenuous and remote cause—of Kohler's

---

[12] Although Kohler suggests Doherty had to turn on the pugmill mixer, (Pl. R. 56.1 ¶ 46), his reliance on Matsen's deposition testimony does not bear that out. Matsen did say that Doherty would have had to activate both the pugmill mixer and the drag conveyor to prevent the generator from dying. (Matsen Dep. at 42-43.) However, Matsen acknowledged Doherty could have turned on a dryer instead. (Id. at 43.)

injury. See Derdiarian, 51 NY.2d at 315 (holding issue of proximate cause is for factfinder to determine only where plaintiff initially shows that defendant's "negligence was a substantial cause" of the injury). "At most, [Harris pulling material from Bin Two] created an opportunity for plaintiff's injuries. Fundamentally, a defendant is not responsible for the harm inflicted 'merely because the situation which his negligence has created has afforded an opportunity . . . for its infliction.'" Penovich v. Schoeck, 676 N.Y.S.2d 253, 254 (3d Dep't 1998) (quoting Restatement (Second) of Torts § 448 cmt. a).[13]

In addition, no reasonable jury could find the existence of proximate cause because the risk of an injury like Kohler's was not the type of risk created by Harris' conduct. Assuming, for the sake of argument, that Harris' conduct was negligent, it created a risk of injury to people working on the conveyor belt or, perhaps, to people near the overloaded dryer. Although Doherty's subsequent negligent conduct might be said to have acted upon Harris's initial negligence, it created an entirely new type of risk, "a different kind of risk from that created by defendant['s] negligence . . . ." See Rodriguez, 697 N.Y.S.2d at 442. That new type of risk posed a danger to a person in a machine 150 feet from the locus of—and completely unaffected by—Harris' initial conduct.[14] Given Doherty's creation of an entirely new risk, there is

---

[13] Kohler also seeks to trace Doherty's activation of the pugmill mixer to Astec's negligent failure to have exchanged lockout/tagout procedures with Vanbro. (Pl. Mem. at 25.) However, that allegedly negligent act is even more remote from Kohler's injury than Harris pulling material from Bin Two. In fact, Harris pulling material from Bin Two is a downstream step in any causal chain starting with the failure to exchange lockout/tagout procedures. The failure to exchange lockout/tagout procedures still requires Harris to pull the material from Bin Two and still requires Doherty to decide to clear the plant's system in the manner that ultimately led to Kohler's injury. The failure to exchange that safety information, even more so than Harris pulling material from Bin Two, did no more than help "create[] an opportunity" for Doherty's negligence to inflict the injury suffered by Kohler. See Penovich, 676 N.Y.S.2d at 254.

[14] To argue that Doherty's actions were foreseeable to Harris, Kohler points to Derdiarian v. Felix Contracting Corporation and Leonardo v. Consolidated Edison Co. of New York, Inc., two cases in which the risk that ripened into plaintiff's injury was precisely the type of risk created by defendant's negligent act. (Pl. Mem. at 22-23.) Kohler asserts that these cases are "analogous" to the facts of the instant case. (Id. at 22.) Kohler's assertion is wrong. See Derdiarian, 51 N.Y.2d at 314-15 (finding that car driving into worksite was precisely risk created by defendant's failure to install sufficiently strong barriers around site); Leonardo v. Consol. Edison Co. of N.Y., Inc.,

absolutely no basis from which a factfinder could conclude that Kohler's injury was a natural or foreseeable result of Harris' conduct.

In sum, to conclude that Harris should have foreseen an injury like Kohler's when he activated the conveyor belts would be to disregard uncontested evidence that points decidedly away from that conclusion. Whatever the initial negligence of Harris's conduct, Kohler's injuries were caused by Doherty's subsequent and independent negligent conduct. They were, to put it simply, unforeseeable from Harris' perspective. Accordingly, there are no facts from which a reasonable jury could infer the existence of proximate cause. Summary judgment is therefore warranted.

## CONCLUSION

For the foregoing reasons, Astec's motion for summary judgment is granted in its entirety, and the Court dismisses the case.[15] The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

Dated: Brooklyn, New York
       February  2 , 2015

                                         s/Carol Bagley Amon
                                         _____
                                         Carol Bagley Amon
                                         Chief United States District Judge

---

719 N.Y.S.2d 234, 234-35 (1st Dep't 2001) (finding that explosion from spark was exactly the risk created by defendant negligently letting gas seep into room). Unlike in Derdiarian or Leonardo, in this case, Kohler being crushed between the paddles of the pugmill mixer was not the result of the kind of risk created by Harris' conduct. It was, instead, the result of the kind of risk created by Doherty's conduct and his conduct only.

[15] Plaintiffs' Second and Third Count are for loss of consortium and negligent supervision. (Compl. at 6-7.) Those claims are derivative of Kohler's primary negligence claim. See Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004) (per curiam) (requiring showing of employee negligence to make out a claim of negligent supervision); Attridge v. Cencorp Div. of Dover Techs. Int'l, Inc., 836 F.2d 113, 118 (2d Cir. 1987) ("[L]oss of consortium claims are derivative . . . ."). The additional claims, therefore, rise or fall with Kohler's primary negligence claim. Accordingly, they fall.